[Civil No. 4098. Filed June 17, 1940.]

[103 Pac. (2d) 467.]

ARIZONA STATE TAX COMMISSION, Appellant, v. TUCSON GAS, ELECTRIC LIGHT AND POWER COMPANY, a Corporation, Appellee.

474

Mr. Joe Conway, Attorney General, and Mr. Allan K. Perry, Special Assistant Attorney General, for Appellant.

Messrs. Darnell, Pattee & Robertson and Messrs. Snell & Strouss, for Appellee.

LOCKWOOD, J.—This is an appeal by Arizona State Tax Commission, hereinafter called the commission, from a judgment of the superior court of Pima county modifying an order of the commission imposing an additional assessment of income tax upon the Tucson Gas, Electric Light and Power Company, hereinafter called the taxpayer. The factual situation upon which the judgment of the court was rendered is not seriously in dispute, and may be stated as follows:

In 1911 the taxpayer became the owner of a certain public utility in the city of Tucson, consisting of an electric light plant, an artificial gas plant and the distributing lines appurtenant thereto. The stock of the taxpayer, with the exception of certain qualifying shares, was owned entirely by the Federal Light and Traction Company, hereinafter called the company, which also owned the majority of the stock of a number of other public utility companies, being what is commonly called a "holding" as distinguished from an "operating" company. The taxpayer is an operating company and has operated its plant, as aforesaid, in the city of Tucson continuously ever since the date first mentioned. Owing to the growth of Tucson and its suburbs and the many changes required by technological discoveries and inventions in the electric light and gas business, it has been necessary to gradually expand the electric light and gas system of the taxpayer, and there has been expended in such expansion ap-

proximately $5,000,000 during the period aforesaid. The income of the taxpayer was not sufficient to pay for this great expansion and it, therefore, made arrangements with the company to supply the capital necessary for that purpose.

The manner in which the business relations of the two companies were carried on and the accounts kept may be stated briefly as follows: An account was opened between the two companies. From time to time as dividends were declared by the taxpayer, all of which under the ownership of stock aforesaid belonged to the company, instead of their being remitted in cash to the latter and then by it formally loaned to the taxpayer, they were permitted to remain with the latter as a cash deposit upon which the taxpayer could draw from time to time, and the company was credited on the account with the amount of such dividends. In addition thereto, the company loaned the taxpayer money and furnished the latter various managerial and engineering services, for which it made certain charges. These items were also credited the company in the account.

From time to time notes were given by the taxpayer to the company to reduce the balance in its favor on the open account, bearing 8 per cent. interest. This interest, instead of actually being paid, was compounded semi-annually, thus increasing the debt of the taxpayer accordingly. Various renewal notes were given from time to time, so that in 1931 the total amount of the notes outstanding and bearing 8 per cent. interest aggregated a little over $3,500,000. Due to the giving of the notes as aforesaid and the declaration of dividends at various times, there were times when the taxpayer had a balance to its credit in the open account, but during most of the time it was indebted in a greater or less sum to the company. When the former condition existed, the taxpayer was credited

with 4 per cent. interest, but in the latter it was charged 6 per cent. by the company.

The books and records of the taxpayer ever since statehood have been kept as requested by the corporation commission, and have clearly shown the above situation, and were at all times open to the commission for its examination. The Arizona Income Tax Act, hereinafter called the act, under which the present suit arose, was enacted at the First Special Session of the legislature in 1933, chapter 8. After its enactment the taxpayer continued to keep its books and records exactly as it had prior thereto, and continued to consider and report the interest on the notes and open account above referred to as an operating expense and a legal and proper deduction from income reported under both federal and state income tax acts. In 1933, and annually thereafter, the taxpayer reported to the commission its income, claiming as a deduction therefrom the interest on the notes and balances above referred to and all of the other items which are in controversy in the present action, with the exception of certain unexpended balances which resulted from contracts for extension service with various of its consumers. These balances were not reported as income nor were deductions claimed therefor.

In 1935 the commission caused a field audit and investigation to be made of the taxpayer in respect to its income for the years 1933 and 1934. Its agents came to the office of the taxpayer and audited and investigated the latter's books and records. These books and records, which disclosed fully the situation above described, were open at all times to the commission's agents. At the completion of the audit and investigation a hearing was had and the commission entered an order levying a certain additional income tax upon the taxpayer, which was promptly paid. Thereafter,

and in 1937, the commission reviewed the returns on the taxpayer's income for the years 1933, 1934, 1935 and 1936, and made certain additions to income and disallowed certain deductions from the report as made by the taxpayer for each of these years, and then assessed it at twice the normal rate, on the ground that it intentionally made an incorrect return with intent to evade the income tax for the four years above mentioned, whereupon the taxpayer appealed to the superior court of Pima county from such order, under the provisions of section 40 of the act. The court, after a hearing, entered judgment reversing the action of the commission in certain parts and affirming it in others, whereupon this appeal was brought before us. Such further statements of details supplementing the above facts will be made from time to time during the course of this opinion as may seem advisable.

The first question arising is the plea of the taxpayer that the commission was barred from reviewing its return of income taxes for the years 1933 and 1934, on the ground of the statute of limitations. The act, in section 36, sets up the limitations on corrections of income tax in the following language:

"*Limitation on corrections.* Corrections or additional assessments of income may be made at any time within two years after the close of the period covered by a report of income; provided, that if in any year no return is filed, income of any such year may be assessed when discovered."

It is urged by the taxpayer that when the commission in 1935 made its field audit of income tax returns for those two years, and levied an assessment thereon, the statute began to run, and that two years had elapsed before it again attempted to review these returns in 1937.

Our income tax law was taken apparently from that of Wisconsin, and the authorities from that state

are, therefore, very persuasive. In the leading case of *State ex rel. Schuster Realty Co.* v. *Lyons,* 184 Wis. 175, 197 N. W. 585, 199 N. W. 48, the Supreme Court of Wisconsin held that after the tax commission had made an assessment for the purpose of the income tax, it exhausted its jurisdiction to further review such assessment *except upon facts which were not available to it when its first assessment was made.* This rule has been followed consistently in Wisconsin ever since, and a distinction is made between assessments based upon an office audit of a return, which assumes the taxpayer has stated correctly the amount of his income and the deductions made and those based on a field audit, which is made by an examination of the records of the taxpayer and all facts bearing upon the true amount due. In the first case, it is held the statute has not begun to run, while in the second it commences with the assessment made on the completion of the field audit, unless new facts are discovered which could not reasonably have been found by the audit.

The trial court found, and the evidence upon which its finding was based shows conclusively that at the time the field audit was made in 1935 all of the books and records of every nature affecting the income of the taxpayer for the period in question were made available to the agents of the commission without any attempt to conceal anything. It is true that the auditing agents stated that due to lack of time they did not make as thorough an examination of the records as they might have, but this was no fault of the taxpayer. We think that the assessment made by the commission, after its field audit in 1935, started the running of the statute of limitations, set forth in section 36, *supra,* and that when it again attempted to review the returns of income made by the taxpayer, it could not consider anything back of the year 1935.

The action of the trial court in setting aside the order of the commission increasing the assessment of the taxpayer for the years 1933 and 1934 was correct.

We consider next the order of the commission as affecting the income tax of the taxpayer for the years 1935 and 1936. This requires a consideration of the various additions and deductions made by the commission, and disallowed or allowed, as the case may be, by the trial court.

The first is the double assessment made by the commission. This was evidently based on subdivision (c) of section 46 of the act, which reads as follows:

"Any person required to make a report of income, who fails to do so, or makes an incorrect report, with intent in either case to defeat or evade the income tax, shall be assessed at twice the normal rate. Such increased assessment shall be in addition to all other penalties. The statute of limitations shall not begin to run as against any such taxpayer until the assessment shall have been made as herein provided."

■ Upon an entire examination and consideration of the record, we think the judgment of the trial court on this point was correct. The double assessment can only be made when the taxpayer not only makes an incorrect return, but when the return was made with intent to defeat or evade the income tax. We think that when all the facts are fully set forth in the report of the taxpayer, an honest mistake as to the meaning and effect of the law allowing deductions from gross income can never bring a taxpayer within the provisions of subdivision (c), *supra*. The statute applies to concealment, misrepresentation or fraud, and not to an honest mistake of law. This brings us to the specific items of deduction involved in the return.

■ There are certain general principles of law which we think apply to the factual situation. It is apparent that the relationship existing between the

taxpayer and the company was not that of the ordinary debtor and creditor dealing contractually at arm's length. The taxpayer was, in effect, one of the arms of the company, operating through a different formal, legal organization. As between the two, it makes little, if any, difference how their records were kept, how credits and debits were allowed, or what rate of interest was charged on balances. All of the net profits of the taxpayer, above operating expenses, sooner or later would pass into the possession of the company for distribution by it as it saw fit, and it would make no difference whether they came by dividends or excessive charges for loans, services or other items. The situation, however, is very different when the rights of the taxing bodies, within whose jurisdiction the taxpayer was, are concerned. If the taxpayer and the company are allowed to arrange their mutual relations in such manner as they see fit, it would be very easy to remove from the jurisdiction of this state the larger part of the income of the taxpayer, without subjecting it to the state income tax. The transactions between the two companies, so far as the imposition of taxes is concerned, must be carefully scrutinized and considered on the basis of what they would reasonably have been between truly independent entities, acting at arm's length, and not what they apparently agreed upon. In other words, the basis is *quantum meruit* and not contract.

There is no question but that the taxpayer correctly reported the facts regarding its income. The error, if any, was in the legality of deductions claimed by it. The first involved the item of interest upon the notes given as aforesaid. These notes were, in effect, given for dividends left with the taxpayer and used by it for capital improvement, for cash advances by the

company, for various services which it claimed it rendered to the taxpayer, and compound interest.

By the express terms of the act interest upon money borrowed for legitimate purposes in conducting a business from which a taxpayer derives its income is a proper deduction from its gross income. It follows that if the taxpayer receives services for which it does not pay, but allows the value of such services to stand as an indebtedness, it may deduct interest which it pays upon such indebtedness. It is also true that interest which is not paid in any year and is not deducted from the gross income of the taxpayer in its return, may be carried over as a capital loan, and interest thereon later allowed in the same manner. Nor, indeed, does the commission deny this principle. It admits the record shows that the notes given by the taxpayer to the company were for items of this nature, but contends that the amount represented by the notes was not a true indebtedness, for the reason that the services rendered were charged for at an excessive figure, and the interest on loans, which was compounded and eventually added to the principal of the notes, was computed at an excessive rate. It appears from the record that the method followed in determining the amount for which notes should be given was commenced in 1912 and carried on continuously thereafter until about 1931, when, as we have said, the last of the notes in question were given.

The commission urges that to arrive at the true amount of indebtedness, we should go back to the commencement of the taxpayer's business in 1912, and consider only the actual net amounts due from time to time to the company by the taxpayer, reduce the allowance for services rendered, and permit the charging of interest at a rate considerably less than the 8 per cent. at which it was computed. In 1912 there was no income tax, either state or federal, in existence, and

only by a process of wild speculation can we assume that the taxpayer and the company deliberately carried on the system of bookkeeping which they did for the purpose of an evasion of a future income tax. To hold a method of doing business which existed for so long should be set aside as of 1912 because twenty years later a tax which the state had just imposed would be increased thereby, if we treated such method as though it was begun and carried on for the express purpose of evading taxes, would violate every principle of justice and common sense.

■■ We are of the opinion that the application of the rule, which we have announced, to the determination of the amount of indebtedness and the rate of interest thereon should not be applied retroactively, but should go into effect as of the time of the adoption of our Income Tax Act. From that time on the taxpayer should be permitted to make deductions only on the basis of a *quantum meruit,* but its actions before then cannot be questioned by the taxing authority. Applying this rule to the item of interest upon the notes in question, it appears to us that their capital value as an indebtedness of the taxpayer in 1933 must stand, but that the rate of interest thereon, which the taxpayer is permitted to deduct thereafter must be determined by the rule of *quantum meruit,* and in applying this rule to the question of interest upon indebtedness, we think the rate of interest to be allowed is that at which the indebtedness could be funded on the open market. There is evidence in the record that the notes in question were deposited as collateral for indebtedness of the company, which bore a rate of interest of 5 per cent. and 6 per cent. Since the real security back of the company indebtedness was the earning power and assets of the operating companies which it controlled, it is but reasonable to presume that the indebtedness of the taxpayer in 1933 could have been

funded then at a rate of interest not greater than 6 per cent.

We hold, therefore, that deductions for interest on the notes in question for the years 1935 and 1936 should be allowed at the rate of 6 per cent. on their capital value as it existed at the time the annual return for income tax purposes was made, and not at 8 per cent., as allowed by the trial court.

The return of the taxpayer made a difference between inter-company interest charged and received upon the open account. The trial court determined that the same rate should apply to both credits and debits, and we think this was proper.

The trial court also held that management fees and engineering and surveying charges paid were proper deductions, and there was not sufficient evidence to show that the amounts so paid were excessive. We think that on the record its conclusion was correct.

The court was also correct in its rulings in regard to interest upon customers' deposits. Under the law, the taxpayer held these deposits as a trustee, and the amount, with interest at 8 per cent., would be payable to the customers, the liability being one which might be enforced at any time. The court found that some of the items deducted as interest on customers' deposits were of a nature which imposed no liability on the taxpayer, but that there was no evidence enabling it to segregate these amounts from that which was a liability, and that, therefore, the commission was without authority to deny the deduction. We agree with this contention, and assume that in future years the commission will see that the proper evidence is obtainable on this point.

The next items are deductions for the expenses of a rate case actually paid out by the taxpayer, and deductions made for the change-over expense from artificial to natural gas. These items were necessary

expenses of conducting the business of the taxpayer, and the evidence shows they were actually paid out by it. The deductions are clearly correct.

The next item is deductions for additional assessments of federal income taxes and the interest thereon. It is admitted by the commission that the deductions for the federal tax itself is correct, but it contends that the interest on such taxes should not be allowed. This court has held that interest which a taxpayer must pay on delinquent taxes is not, in the true sense of the law, a tax but a penalty, and penalties for the violation of law are not properly deductible. The trial court properly allowed the one deduction and refused the other.

The last item is unexpended balance for customers' contributions for extension. This refers to amounts which the taxpayer was in the habit of charging customers for extending service as requested. Under some circumstances utility companies allow these amounts to be refunded, under others do not. The court found the present taxpayer does not refund, and, therefore, concluded that this should be credited to the plant account and used to reduce the value of the property of the taxpayer which is subject to depreciation, but that depreciation could not be allowed on the unexpended balance itself, and ordered that a correction be made in that respect. This disposes of the various questions raised on this appeal.

The judgment of the trial court is affirmed in all respects, except as to the allowance of deductions of interest on notes, calculated at the rate of 8 per cent., and that portion of the judgment is reversed and remanded to the trial court with instructions to make the necessary correction by allowing deductions at the rate of 6 per cent.

ROSS, C. J., and McALISTER, J., concur.